## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## ABINGDON DIVISION

| | | |
|---|---|---|
| **SHANNON DOBY,**[1] **Substitute Party** | ) | |
| **for Daniel Craig Arnold, deceased,** | ) | Civil Action No. 1:21cv00035 |
|   Plaintiff | ) | |
| | ) | **REPORT AND** |
| v. | ) | **RECOMMENDATION** |
| | ) | |
| **KILOLO KIJAKAZI,**[2] | ) | By: PAMELA MEADE SARGENT |
| **Acting Commissioner, Social Security** | ) | United States Magistrate Judge |
| **Administration,** | ) | |
|   Defendant | ) | |

*I. Background and Standard of Review*

Plaintiff, Shannon Doby, ("Doby"), pursues this action on behalf of her deceased brother, Daniel Craig Arnold, ("Arnold"), challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying his claim for disability insurance benefits, ("DIB"), under the Social Security Act, as amended, ("Act"), 42 U.S.C. § 423 *et seq.* Jurisdiction of this court is pursuant to 42 U.S.C. § 405(g). This case is before the undersigned magistrate judge by referral pursuant to 28 U.S.C. § 636(b)(1)(B). As directed by the order of referral, the undersigned now submits the following report and recommended disposition.

---

[1] On February 11, 2022, counsel for the claimant, Daniel Craig Arnold, filed a Motion For Substitution Of Party, stating that Arnold died on December 25, 2021, subsequent to the filing of the Complaint. (Docket Item No. 13.) Counsel requested that Arnold's sister, Shannon Doby, be substituted as the plaintiff in this case, pursuant to 20 C.F.R. § 404.503(b) and Rule 25(a)(1) of the Federal Rules of Civil Procedure, to pursue Arnold's claim. The motion was granted by Order entered March 11, 2022. (Docket Item No. 18.)

[2] Kilolo Kijakazi became the Acting Commissioner of Social Security on July 9, 2021. Pursuant to Federal Rules of Civil Procedure Rule 25(d), Kilolo Kijakazi is substituted for Andrew Saul as the defendant in this suit.

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Arnold protectively filed his application for DIB[3] on February 6, 2019, alleging disability as of December 21, 2017,[4] based on major depression;

---

[3] On March 6, 2015, Arnold filed an application for DIB, alleging disability as of February 18, 2015. (R. at 86.) By decision dated December 20, 2017, the ALJ denied Arnold's claim. (R. at 86-95.) Thereafter, this court upheld the ALJ's unfavorable decision. *See Daniel A. v. Saul*, Civil Action No. 7:19cv61 (W.D. Va. July 24, 2020).

Pursuant to the Fourth Circuit's opinion in *Albright v. Comm'r of Soc. Sec. Admin.,* 174 F.3d 473 (4th Cir. 1999), and in accordance with Social Security Acquiescence Ruling, ("AR"), 00-1(4), "[w]hen adjudicating a subsequent disability claim arising under the same…title of the Act as the prior claim, an adjudicator determining whether a claimant is disabled during a previously unadjudicated period must consider such a prior finding as evidence" and consider its persuasiveness in light of all relevant facts and circumstances. A.R. 00-1(4), 65 Fed. Reg. 1936-01, at *1938, 2000 WL 17162 (Jan. 12, 2000). It is noted that, when *Albright* was decided, the agency "weighed" opinion evidence under different standards. *See* 56 Fed. Reg. 36932-01 at *36960, 1999 WL 142361 (Aug. 1, 1991). Those standards have been superseded by 20 C.F.R. §§ 404.1520c, 416.920c, which prescribes how to consider persuasiveness of opinion evidence and prior administrative findings in claims made on or after March 27, 2017. Because this claim was made after March 27, 2017, the ALJ is required to consider prior ALJ decisions and Appeals Council findings under *Albright. See* Program Operations Manual System, ("POMS"), DI 24503.005, available at http://policy.ssa.gov/poms.nsf/lnx/0424503005 (effective Apr. 13, 2021) (explaining the categories of evidence).

The ALJ in this case noted she reviewed the previous 2017 decision and found it to be "mostly persuasive." (R. at 23-24.) The ALJ noted the previous ALJ found severe impairments of major depression and general anxiety disorder, with which she agreed. However, she added an additional severe impairment of psychotic disorder. Moreover, the ALJ adopted the prior ALJ's finding that Arnold was capable of understanding, remembering and carrying out simple tasks; working in an environment with few day-to-day changes; and occasional interaction with co-workers and supervisors, but she also limited him to a low level of work pressure, based on new and material evidence.

[4] In his DIB application, Arnold alleged a disability onset date of February 18, 2015. (R. at 258.) However, he amended this date at his hearing to December 21, 2017, the day following the date of a prior unfavorable decision. (R. at 15, 39-40.)

psychosis; anxiety; and paranoia. (Record, ("R."), at 258-59, 310.) The claim was denied initially and upon reconsideration. (R. at 130-32, 136-38, 141, 144-46, 148-50.) Arnold then requested a hearing before an administrative law judge, ("ALJ"). (R. at 151-52.) The ALJ held a hearing on November 5, 2020, at which Arnold was represented by counsel. (R. at 34-70.)

By decision dated November 18, 2020, the ALJ denied Arnold's claim. (R. at 15-27.) The ALJ found Arnold met the nondisability insured status requirements of the Act for DIB purposes through December 31, 2020. (R. at 18.) The ALJ found Arnold had not engaged in substantial gainful activity since the alleged onset date.[5] (R. at 18.) The ALJ determined that, through the date last insured, Arnold had severe impairments, namely major depressive disorder; generalized anxiety disorder; and psychotic disorder, but she found Arnold did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 18.)

The ALJ found Arnold had the residual functional capacity to perform work at all exertional levels, but with the following nonexertional limitations: (1) he could perform simple, routine tasks involving no more than one to two steps and simple, work-related decisions; (2) he could understand, remember and carry out simple instructions and make simple, work-related decisions; (3) he could tolerate a low level of work pressure, defined as work not requiring multitasking, detailed job tasks, significant independent judgment, very short deadlines or teamwork in job task completion; (4) he could work at a consistent pace throughout the workday, but not at a production-rate pace, requiring task completion within a strict time deadline; (5) he could sustain an ordinary routine without special supervision and could tolerate occasional changes in the work setting; (6) he could tolerate

---

[5] Therefore, Arnold must show he was disabled between December 21, 2017, the amended alleged onset date, and November 18, 2020, the date of the decision, to be eligible for benefits.

occasional interaction with co-workers and supervisors; (7) he could participate and cooperate with supervisors and co-workers during the training period for unskilled work; and (8) he could not interact with the public. (R. at 20.) The ALJ found Arnold was not able to perform his past relevant work as a corrections officer. (R. at 25.) However, the ALJ found that, based on Arnold's age, education, work history and residual functional capacity and the testimony of a vocational expert, a significant number of jobs existed in the national economy that Arnold could perform, including the jobs of a housekeeping cleaner, a cleaner II and a collator operator. (R. at 25-26, 61-64.) Thus, the ALJ concluded Arnold was not under a disability as defined by the Act through the date of the decision, and he was not eligible for DIB benefits. (R. at 27.) *See* 20 C.F.R. § 404.1520(g) (2021).

After the ALJ issued her decision, Arnold pursued his administrative appeals, (R. at 254-55, 378-82), but the Appeals Council denied his request for review. (R. at 1-5.) Arnold then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. § 404.981 (2021). This case is before this court on Arnold's motion for summary judgment filed February 14, 2022, and the Commissioner's motion for summary judgment filed March 14, 2022.

## II. Facts

Arnold was born in 1970, (R. at 258), which, at the time of the amended alleged onset date, classified him as a "younger person" under 20 C.F.R. § 404.1563(c), and as a "person closely approaching advanced age" under 20 C.F.R. §404.1563(d), at the time of the ALJ's decision. He has a high school education and past work experience as a corrections officer. (R. at 302, 311.) Arnold testified he lived in an apartment with his elderly mother, who suffered from schizophrenia. (R. at 44.) He stated he received disability retirement benefits through the Virginia Retirement System. (R. at 44-45.) Arnold testified he last worked in February 2015, when his psychiatrist removed him from work after being psychiatrically hospitalized for the third time. (R. at 50-51.) However, he

stated he had not been psychiatrically hospitalized during the time period relevant to his claim. (R. at 49-50.) Arnold stated he worked as a corrections officer at a prison for almost 17 years, which he liked. (R. at 53-54.) He testified he had a driver's license and drove to the grocery store, to his sister's house once in a while, to the post office to mail bills and to take his mother to medical appointments. (R. at 45-46.) He said he grocery shopped once every week or two, but regularly delayed it because he did not want to go out in public. (R. at 57.) Arnold stated that, more often than not, he did not want to leave the house. (R. at 57.) He said the furthest had had traveled since 2017 was to his psychiatrist, approximately 35 miles from his home. (R. at 47.) Arnold said he was not a social person, but he had one friend he talked to on the phone, but whom he had not seen in about three years. (R. at 46.) Arnold testified he did not attend church or go to the movies, stating he did not like to be around crowds because he was paranoid and felt like people watched and talked about him. (R. at 46.) He said he tended to isolate at home, sometimes even staying in his room. (R. at 58.)

Arnold testified he had psychiatric appointments approximately every three months, but sometimes longer. (R. at 47-48.) He said he was taking Risperdal, Bupropion XL and hydroxyzine, which helped, but did not cure his symptoms. (R. at 51.) Arnold explained that his paranoia always was there, just to a lesser degree with the medications. (R. at 59.) He stated he had long-term memory difficulty; problems with concentration and focus; he worried a lot; his mind often was preoccupied; he had difficulty falling asleep, but then slept 12 hours; he lacked energy most of the time; and he often felt hopeless. (R. at 51-52, 55-56.) According to Arnold, he did not have any interests, and he only looked forward to seeing his daughter approximately twice yearly. (R. at 56.) He testified he watched television for 12 hours daily, and he played video games for hours. (R. at 46-47.) He said he did laundry and dishes, but his mother had someone clean the apartment monthly. (R. at 47.) Arnold testified he was able to read, write, do simple math and take care of his bills. (R. at 52.) He testified the thought of working a simple, easy job for eight hours a day, five

days a week, would make him paranoid and psychotic and result in him being hospitalized. (R. at 59.)

Sherry Kristal-Turetzky, a vocational expert, also was present and testified at Arnold's hearing. (R. at 60-69.) She classified his past work as a corrections officer as between medium[6] and very heavy[7] and semi-skilled. (R. at 61.) Kristal-Turetzky testified that a hypothetical individual of Arnold's age, education and work experience, who was limited to the performance of simple, routine tasks, involving no more than one or two steps and simple work-related decisions; who could understand, remember and carry out simple instructions and make simple, work-related decisions; who could tolerate a low level of work pressure; who could work at a consistent pace throughout the workday, but not at a production-rate pace; who could sustain an ordinary routine without special supervision and could tolerate occasional changes in the work setting; who could tolerate occasional interaction with co-workers and supervisors; who could participate and cooperate with supervisors and co-workers during the training period for unskilled work; and who could have no interaction with the public, could not perform Arnold's past work as a corrections officer. (R. at 61-62.) However, she testified this individual could perform other jobs existing in significant numbers in the national economy, including those of a housekeeping cleaner, a photocopy machine operator, a cleaner II and a collator operator. (R. at 62-64.) When Kristal-Turetzky was asked to consider the same hypothetical individual, but who could have no interaction with co-workers, supervisors or the public, she said there would be no work. (R. at 64.) She also testified there would be no jobs for an individual who would be off task more than 20 percent of the workday, as the customary tolerance for off-task behavior is 10 percent, and that an inability to maintain concentration

---

[6] Medium work involves lifting items weighing up to 50 pounds at a time with frequent lifting or carrying of items weighing up to 25 pounds. If someone can do medium work, he also can do light and sedentary work. *See* 20 C.F.R. § 404.1567(c) (2021).

[7] Very heavy work involves lifting items weighing more than 100 pounds at a time with frequent lifting or carrying of items weighing 50 pounds or more. If someone can do very heavy work, he also can do heavy, medium, light and sedentary work. *See* 20 C.F.R. § 404.1567(e)(2021).

for extended periods also would result in an no jobs. (R. at 65-66, 68.) She further testified there would be no work for an individual who would be absent from work more than two days monthly, as the reasonable and customary tolerance for absenteeism is one day monthly. (R. at 67.) Next, Kristal-Turetzky stated that an individual with the following marked impairments, either individually or collectively, would eliminate all jobs: maintain attention for two-hour segments; sustain an ordinary work routine without special supervision; work in coordination or in proximity to others without being unduly distracted; make simple work-related decisions; complete a normal workday or workweek without interruptions from psychologically based symptoms; perform at a consistent pace without an unreasonable number and length of rest periods; ask simple questions or request assistance; accept instructions and respond appropriately to criticism from supervisors; get along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes; and/or respond appropriately to changes in a routine setting. (R. at 66-69.)

In rendering her decision, the ALJ reviewed records from Twin County Center for Behavioral Health; Dr. Lillian Somner, D.O., a psychiatrist; Jacquelyn Thayer, M.H.N.P., a mental health nurse practitioner; Wythe County Community Hospital; Twin County Regional Hospital; Carilion Clinic; Robert C. Miller, Ed.D., L.C.P., a licensed clinical psychologist; David Deaver, Ph.D., a state agency psychologist; and Joseph Leizer, Ph.D., a state agency psychologist.

The record shows that Arnold was psychiatrically hospitalized for five days in December 2011 on a temporary detention order for paranoid delusions and depression. (R. at 445.) Dr. Lillian Somner, D.O., Arnold's treating psychiatrist, in February 2015 noted this might have been triggered by marked sleep deprivation due to his odd work schedule as a corrections officer. (R. at 445.) Dr. Somner noted he had done very well since his discharge, and he had gotten his gun rights restored, enabling him to return to work in January 2012. (R. at 445.)

The record shows that Arnold was voluntarily hospitalized twice in six months between 2014 and 2015 for paranoid psychosis. (R. at 413, 437, 473-83, 518-30.) His discharge diagnosis in August 2014 was psychotic disorder, not otherwise specified, and in February 2015, it was severe major depression with psychotic features. (R. at 473, 518.) Again, it was felt that the stress of his job and the long and irregular hours were contributing factors. (R. at 413.) On March 4, 2015, although Dr. Somner advised Arnold she would not allow him to return to work as a corrections officer because the odd hours and being "on guard" all the time overwhelmed him, she did not prohibit him from performing other work. (R. at 436.) Thereafter, Arnold retired from his position, sought disability retirement and, subsequently, filed for DIB benefits. On May 7, 2015, Arnold advised Dr. Somner he had been denied disability retirement because he was found capable of performing work other than that of a corrections officer. (R. at 422.) However, he told Dr. Somner he did not want to work a different job because it was "all he knows and he has no other training." (R. at 422.) On April 5, 2016, Arnold said he did not think he could work because he was too anxious around other people. (R. at 409.)

On July 1, 2017, more than five months prior to the amended alleged onset date, Dr. Somner completed a Mental Residual Functional Capacity Assessment, noting she had treated Arnold for major depression with psychosis approximately every three months with medication management since January 12, 2012. (R. at 673-76.) Dr. Somner opined Arnold was markedly[8] limited in the majority of areas assessed, and she opined his impairment would substantially interfere with his ability to work on a regular and sustained basis at least 20 percent of the time. (R. at 674-76.) Dr. Somner further opined Arnold could not work on a regular and sustained basis, in light of his mental impairment, and he would miss work 30 days monthly. (R. at 676.) She deemed his prognosis as poor. (R. at 673.) Dr. Somner explained she removed Arnold from work as a corrections officer due to his mental illness, which was worsening over time. (R. at 676.)

---

[8] A marked limitation is defined on this Assessment as a serious limitation on the ability to function. (R. at 674.)

On July 11, 2017, approximately five months prior to the amended alleged onset date, Arnold reported he was staying with his mother much of the time because he could not afford his increased rent. (R. at 399.) On mental status examination, he was clean and well-groomed with cooperative and calm behavior; he made eye contact; speech was fluent, clear and of normal volume; he had no hallucinations; he was alert and fully oriented; he had intact memory; he was of average intelligence; he had an anxious mood and was nervous about everything, with a congruent affect; insight, judgment, motor activity and thought process were intact; and thought content was unremarkable. (R. at 399.) Dr. Somner diagnosed generalized anxiety disorder and recurrent major depression, in partial remission, and she increased Arnold's risperidone dosage. (R. at 399.) She also continued him on bupropion and hydroxyzine. (R. at 398.)

By October 11, 2017, Arnold reported he was living with his mother. (R. at 397.) He stated he was "stable," and he described his mood, sleep and anxiety as "ok I guess." (R. at 397.) Arnold denied paranoia, sleep disturbance, hallucinations and suicidal ideation. (R. at 397.) Mental status examination was unchanged, except Dr. Somner did not note he was very nervous. (R. at 397.) She also noted Arnold was more anxious appearing than usual. (R. at 397.) Dr. Somner's diagnoses remained the same, as did Arnold's medication regimen. (R. at 396-97.)

On January 10, 2018, Dr. Edward Jeffer, M.D., another psychiatrist, noted Arnold was doing well, with no acute concerns. (R. at 395.) He continued to report chronic depression, which appeared to be "situational and personality driven." (R. at 395.) Arnold denied acute depression, suicidal or homicidal ideation and hallucinations, and he reported stable sleep and appetite. (R. at 395.) He said he mostly stayed home with his mother and did not have very many hobbies or social activities. (R. at 395.) Arnold was alert, fully oriented and neatly groomed, with slow speech, a depressed mood and a blunted, yet euthymic, affect. (R. at 395.) Thought processes were linear and goal-oriented; thought content was without rumination and delusional content; attention was intact; insight and

judgment were good. (R. at 395.) Dr. Jeffer diagnosed major depressive disorder, recurrent, in partial remission. (R. at 395.) He was advised to continue his psychotropic medications. (R. at 395.)

On April 4, 2018, Dr. T.K. Reese, M.D., a psychiatrist, stated Arnold continued to have a low level of depression, and he felt his medications were stable. (R. at 393.) Arnold reported good sleep and appetite, and he denied suicidal and homicidal ideations and hallucinations. (R. at 393.) Mental status examination was unchanged, and Dr. Reese found his recurrent major depression was in full remission. (R. at 393.) Arnold's medication regimen was continued. (R. at 393.) On September 25, 2018, Dr. Reese stated Arnold was doing well, with no acute concerns. (R. at 391.) Although he continued to have periods of low mood and energy, Arnold reported this was his baseline. (R. at 391.) He also reported continuing anxiety about interacting with others, stating he preferred to be with family members. (R. at 391.) Nonetheless, Arnold stated he was able to complete activities of daily living and errands. (R. at 391.) He said his appetite was fair, and he denied suicidal and homicidal ideations, as well as hallucinations. (R. at 391.) Mental status examination was unchanged, except Arnold described his mood as "okay, I guess." (R. at 391.) Dr. Reese diagnosed recurrent major depression in full remission. (R. at 392.) When Dr. Reese suggested adding an anti-depressant, Arnold was hesitant due to potential side effects. (R. at 392.)

On December 18, 2018, Arnold had no acute concerns, and Dr. Reese described his condition as stable. (R. at 389.) Specifically, Arnold denied depression, he was sleeping well, he had a good appetite, and he denied suicidal and homicidal ideation, as well as hallucinations. (R. at 389.) Arnold reported continued social isolation, and he reported having a panic attack prior to meeting with family for Thanksgiving. (R. at 389.) He continued to express his concern with the disability process. (R. at 389.) His mental status examination was unchanged, and Dr. Reese continued Arnold's medications. (R. at 389.) On April 1, 2019, Arnold continued to report depression and isolation, stating, "I've always

done that. I don't like to talk to people." (R. at 387.) Dr. Reese noted a good sleep structure and good appetite, and Arnold denied suicidal and homicidal ideations, as well as hallucinations. (R. at 387.) He had no acute medical concerns. (R. at 387.) On mental status examination, Arnold was alert, fully oriented and neatly groomed; he was anxious with slow speech; he had a depressed mood with congruent affect and appeared dysthymic; thought process was linear and goal-oriented; thought content was without rumination and delusional content; attention was intact; and insight and judgment were good. (R. at 387.) Dr. Reese diagnosed recurrent major depression, in partial remission, and he continued Arnold on his medications. (R. at 387.)

On April 16, 2019, David Deaver, Ph.D., a state agency psychologist, completed a Psychiatric Review Technique form, ("PRTF"), in connection with the initial consideration of Arnold's DIB claim. (R. at 110.) Deaver opined Arnold suffered from a depressive, bipolar and related disorder and anxiety and obsessive-compulsive disorder, and he was mildly limited in his ability to understand, remember or apply information and to adapt or manage himself; and moderately limited in his ability to interact with others and to concentrate, persist or maintain pace. (R. at 110.) He noted Arnold seemed stable on medications and had no psychiatric hospitalizations since 2015, and he opined Arnold could perform simple, unskilled work. (R. at 110.) Deaver also completed a Mental Residual Functional Capacity Assessment, on April 16, 2019, finding Arnold had no understanding and memory limitations and no adaptation limitations. (R. at 112-13.) He found Arnold was moderately limited in his ability to carry out detailed instructions; to maintain attention and concentration for extended periods; to work in coordination with or in proximity to others without being distracted by them; to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. (R. at 112-13.) He also found that Arnold would be limited in his ability to interact appropriately with the general public; to accept instructions and respond appropriately to criticism from supervisors; and to get along with co-workers or peers without distracting them or

exhibiting behavioral extremes. (R. at 112-13.) In all other areas, Arnold was deemed not significantly limited. (R. at 112-13.) Deaver opined Arnold could complete simple, repetitive tasks and interact with others occasionally and work independently. (R. at 113.)

On May 23, 2019, Joseph Leizer, Ph.D., another state agency psychologist, completed a PRTF, which mirrored Deaver's findings. (R. at 121-22.) In addition, Leizer noted that, although Arnold remained symptomatic since quitting his job in 2015, his paranoia largely had resolved, but he had remained chronically depressed. (R. at 122.) Nonetheless, Leizer concluded Arnold did not demonstrate a total inability to work, as he was able to care for his mother, maintain her household, drive and perform basic activities of daily living without major difficulty. (R. at 122.) Leizer also completed a Mental Residual Functional Capacity Assessment, which mirrored Deaver's. (R. at 124-25.) In addition, Leizer stated that Arnold's daily functioning and symptom control appeared adequate such that he could successfully perform unskilled work. (R. at 125.)

On November 18, 2019, Arnold saw Jacquelyn Thayer, M.H.N.P., a mental health nurse practitioner at Twin County Center for Behavioral Health, for medication refills. (R. at 448-49.) Thayer found he was stable on his antipsychotic medications. (R. at 449.) Arnold denied hallucinations, but he was flat with a slightly off gait. (R. at 449.) He reported he was working on disability paperwork, and he reported having a "psychotic break" when he worked as a corrections officer. (R. at 449.) Arnold denied depression, anxiety, hallucinations, sleep disturbances and suicidal thoughts. (R. at 449.) He reported sleeping during the day and being up at night. (R. at 449.) Arnold further reported he did not "like people much." (R. at 449.) On mental status examination, he was clean, well-groomed, alert and fully oriented, with cooperative and calm behavior; he had poor/flat eye contact; speech was clear and of normal volume; he denied current hallucinations; memory, insight and judgment were intact; affect was flat; thought processes were linear and logical; thought content was unremarkable; he denied thoughts of passive or active harm to self or others; and he had a slight tremor. (R. at 449.) Thayer diagnosed Arnold with psychotic

disorder and recurrent major depression, in full remission, and she continued his medication regimen. (R. at 450.)

On February 25, 2020, Thayer completed a Mental Impairment Questionnaire, stating she had treated Arnold since January 12, 2012, for major depressive disorder with psychotic features. (R. at 454-56.) She noted his prognosis for the psychotic disorder was poor, and his recurrent major depression with psychosis was in partial remission. (R. at 454.) Thayer listed Arnold's signs and symptoms as including a blunt, flat or inappropriate affect; feelings of guilt or worthlessness; generalized persistent anxiety; persistent disturbances of mood or affect; paranoid thinking or inappropriate suspiciousness; emotional withdrawal or isolation; intense and unstable interpersonal relationships and impulsive and damaging behavior; disorientation to time and place; perceptual or thinking disturbances; emotional lability; deeply ingrained, maladaptive patterns of behavior; loosening of associations; illogical thinking; vigilance and scanning; pathologically inappropriate suspiciousness or hostility; easy distractibility; memory impairment – short-, intermediate or long-term; and sleep disturbance. (R. at 454.) She opined Arnold had no[9] limitations in his ability to be aware of normal hazards and take appropriate precautions; and to understand, remember and carry out detailed instructions; mild[10] limitations in his ability to remember work-like procedures; to understand and remember very short and simple instructions; to set realistic goals or make plans independently of others; and to adhere to basic standards of neatness and cleanliness; moderate[11] limitations in his ability to carry out very short and simple instructions; to maintain regular attendance and be punctual within customary, usually strict tolerances; to deal with stress of semi-skilled and

---

[9] No limitations are defined as minimal limitations. (R. at 455.)

[10] Mild limitations are defined as some limitation, but the individual generally can function well. (R. at 455.)

[11] Moderate limitations are defined as leaving the individual with an ability to function satisfactorily. (R. at 455.)

skilled work; and to interact appropriately with the general public; and marked[12] limitations in his ability to maintain attention for two-hour segments; to sustain an ordinary routine without special supervision; to work in coordination with or in proximity to others without being unduly distracted; to make simple, work-related decisions; to complete a normal workday and workweek without interruptions from psychologically based symptoms; to perform at a consistent pace without an unreasonable number and length of rest periods; to ask simple questions or request assistance; to accept instructions and respond appropriately to criticism from supervisors; to get along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes; to respond appropriately to changes in a routine work setting; to deal with normal work stress; to maintain socially appropriate behavior; to travel in unfamiliar places; and to use public transportation. (R. at 455.) Thayer opined Arnold was moderately restricted in his activities of daily living; had marked[13] difficulty in maintaining social functioning and had marked deficiencies of concentration, persistence or pace; and had experienced four or more repeated episodes of decompensation, each of at least two weeks duration and within a 12-month period. (R. at 456.) Thayer opined Arnold would be absent from work more than four days monthly. (R. at 456.) She noted Arnold was removed from work by his psychiatrist due to an inability to function and the risk of severe decompensation. (R. at 456.) Lastly, Thayer related the limitations contained in the Questionnaire back to January 18, 2015. (R. at 456.)

When Arnold returned to Thayer on May 11, 2020, he endorsed a continued low level of depression, as well as a loss of interest, but he denied irritability, hallucinations and suicidal and homicidal ideations. (R. at 462.) He reported he had one friend with whom

---

[12] Marked limitations means the ability to function is severely limited, but not precluded. The individual cannot satisfactorily perform the activity independently, appropriately, effectively and on a sustained basis in a regular work setting. (R. at 455.)

[13] This Questionnaire defines marked as more than moderate, but less than extreme. A marked limitation may arise when several activities or functions are impaired or even when only one is impaired, so long as the degree of limitation is such as to seriously interfere with the ability to function independently, appropriately, effectively and on a sustained basis. (R. at 456.)

he spoke on the phone. (R. at 462.) Arnold stated he lived with his mother, who was dependent upon him for daily companionship and care, including bringing her groceries and driving her to appointments. (R. at 462.) On mental status examination, Arnold was alert and fully oriented, clean and well-groomed, and he appeared formidable at times. (R. at 462.) Eye contact was guarded/withholding; speech was pressured, but of normal volume; he had no hallucinations; his mood was described as staying depressed and shut in all the time, and his affect was sad and tearful and congruent to thought content; insight was impaired and marginal, as he was depressed, but unwilling and unable to adjust his medication since 2017; judgment was impaired; thought processes were intact, although he stated, "I get confused sometimes, as far as to the date or maybe how to proceed socially;" and thought content was unremarkable. (R. at 462.) Arnold reported using sleep as a form of escape. (R. at 462.) Thayer's diagnoses remained unchanged, and she continued Arnold's medication regimen. (R. at 463.) On August 3, 2020, Arnold reported depression, anxiety and sleep disturbances, again noting he used sleep as an escape. (R. at 709.) He denied medication side effects, hallucinations and suicidal thoughts. (R. at 709.) Mental status examination was the same, except it also was noted Arnold's motor activity was intact. (R. at 710.) Thayer diagnosed Arnold with generalized anxiety disorder; recurrent major depression;[14] and psychotic disorder, and she continued his medications. (R. at 711.) She again noted that, despite depressive symptoms, Arnold was unwilling to change his medications. (R. at 711.)

On September 10, 2020, Robert C. Miller, Ed.D., L.C.P., a licensed clinical psychologist, completed a psychological evaluation of Arnold at his counsel's request. (R. at 699-706.) Arnold stated he felt if he "had to do any kind of work [he] would be back in the hospital" due to decompensation brought on by work stressors. (R. at 699.) Miller noted Arnold's decompensation episodes included paranoia, and Arnold stated, "It's like people are talking about me and watching me." (R. at 699-700.) He stated he could read, write and

---

[14] She diagnosed recurrent major depression "in full remission" and "in partial remission." (R. at 711.)

perform basic math, but he could not remember what he read. (R. at 701.) Arnold reported he began having memory issues with the onset of his mental health problems. (R. at 701.) He stated he watched television and played Nintendo "for hours," and, although he watched movies, it was hard to "keep up" it if had "a lot of twists and turns." (R. at 702.) Arnold reported he was not a social person, and being in public caused anxiety. (R. at 702.) He was able to handle his personal finances and had a checking account. (R. at 702.) Although he had a driver's license, Arnold was driven to the appointment by his sister. (R. at 702.)

Miller noted that rapport was fair, and Arnold was shy, reserved, cooperative and fully oriented. (R. at 702.) Eye contact was engaged; grooming and hygiene were appropriate; he had low energy; facial expression was neutral; and he displayed a minimal sense of humor. (R. at 702.) Arnold's speech was logical and coherent, and responses to questions included minimal detail. (R. at 702.) Psychomotor activity was characterized by slow movements and activity level. (R. at 702.) Arnold had an anxious mood, with a flat affect. (R. at 702.) A depression screening indicated moderate to severe depressive symptoms. (R. at 702.) Arnold stated he sometimes stayed up all night and slept during the day, and he estimated he slept 12 hours daily. (R. at 702.) He stated, "I don't ever have much energy at all." (R. at 702.) He denied suicidal ideation, intent or plan. (R. at 702.) Symptoms of anxiety included generalized worry, and Arnold reported he sometimes had panic attacks. (R. at 703.) Miller noted he was fidgety and picked the skin around his fingernails. (R. at 703.) He reported no post-traumatic stress disorder, ("PTSD"), symptoms or symptoms of bipolar disorder and no significant obsessive-compulsive disorder, ("OCD"), symptoms. (R. at 702-03.) Miller noted Arnold was socially phobic, but he denied hallucinations, and psychotic features and significant paranoia were not evident at the time of the examination, indicating treatment and stress reduction had helped manage his disorder. (R. at 703.)

Arnold's memory functioning was normal, but his personal pace and ability to process information efficiently and quickly was slowed by depressed mood and, possibly,

medication effects. (R. at 703.) He supplied minimal details when recalling personal history. (R. at 703.) Arnold recalled three words immediately after one rehearsal and, again, five minutes later, and he recalled Miller's name 30 minutes after being introduced. (R. at 703.) Arnold was able to recite the alphabet and spelled "house" and his last name forwards and backwards. (R. at 703.) He successfully repeated digits after one rehearsal, and he knew his birthdate and Social Security number. (R. at 703.) Abstract reasoning generally was intact, and Arnold satisfactorily interpreted proverbs. (R. at 703.) Judgment and social judgment were stable, and no problems with impulse control were evident. (R. at 703.)

Miller estimated Arnold's intellectual ability was in the low average range, but, based on the Adaptive Behavior Assessment System – Third Edition, ("ABAS-3"), his daily adaptive functioning was estimated to be extremely limited. (R. at 703.) The Personality Assessment Inventory, ("PAI"), indicated, among other things, significant elevation on the depression scale, as well as maladaptive behaviors directed at controlling anxiety. (R. at 704.) Evidence of negative psychotic symptoms[15] was significantly elevated, and cognitive symptoms was moderately elevated. (R. at 705.) Miller noted Arnold was principally diagnosed with major depressive disorder, severe and recurrent, with psychotic features, in partial remission; persistent depressive disorder; and generalized anxiety disorder. (R. at 705.) He further stated that, given Arnold's history of delusions, hallucinations and negative symptoms, a diagnostic consideration of schizophrenia may be considered moving forward. (R. at 705.) Miller opined efforts directed at returning Arnold to work would substantially increase the risk of decompensation, and his prognosis for improvement in functioning beyond his current functioning was considered poor. (R. at 705-06.) Miller opined these limitations would relate back to January 18, 2015. (R. at 712.)

---

[15] Examples of negative psychotic symptoms are apathy and avolition, lack of emotion and diminished emotional expression and poor or non-existent social functioning. (R. at 705.)

*III. Analysis*

The Commissioner uses a five-step process in evaluating DIB claims. *See* 20 C.F.R. § 404.1520 (2021). *See also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to his past relevant work; and 5) if not, whether he can perform other work. *See* 20 C.F.R. § 404.1520. If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. § 404.1520(a)(4) (2021).

Under this analysis, a claimant has the initial burden of showing that he is unable to return to his past relevant work because of his impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C. § 423(d)(2)(A); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

As stated above, the court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. This court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided her decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all the relevant evidence

and whether the ALJ sufficiently explained her findings and her rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Doby argues the ALJ erred by improperly evaluating the opinion evidence. (Memorandum In Support Of Motion For Summary Judgment, ("Plaintiff's Brief"), at 3, 11-14.) Doby also argues the ALJ erred by failing to conduct a proper function-by-function analysis of Arnold's work-related abilities. (Plaintiff's Brief at 3, 8-11.) Lastly, Doby argues the ALJ erred by failing to resolve an apparent conflict between the vocational expert's testimony and the Dictionary of Occupational Title's, ("DOT"), description of the requirements of two of the three occupations the vocational expert found Arnold could perform based on the ALJ's residual functional capacity finding. (Plaintiff's Brief at 10-11 n.4.)

Because this matter involves a claim filed after March 27, 2017, a new regulatory framework applies to the ALJ's evaluation of medical opinions in the record. For applications filed on or after March 27, 2017, the Social Security Administration, ("SSA"), has enacted substantial revisions to the regulations governing the evaluation of opinion evidence. *See* Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. 5844-01, 2017 WL 168819 (Jan. 18, 2017) (technical errors corrected by 82 Fed. Reg. 15132-01, 2017 WL 1105368 (Mar. 27, 2017)). Under the new regulations, ALJs no longer are required to assign an evidentiary weight to medical opinions or to accord special deference to treating source opinions. *See* 20 C.F.R. § 404.1520c(a) (2021) (providing that ALJs "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [a claimant's] medical sources").[16]

---

[16] The new regulations define a "medical opinion" as "a statement from a medical source about what you can still do despite your impairment(s) and whether you have one or more impairment-related limitations or restrictions" in the abilities to perform the physical, mental or other demands of work activity or to adapt to environmental conditions. 20 C.F.R. § 404.1513(a)(2) (2021). Those regulations also define a "prior administrative medical finding" as a "finding, other than the ultimate determination about whether [a claimant is] disabled, about a

Instead, an ALJ must consider and articulate how *persuasive* she finds all the medical opinions and all prior administrative medical findings in a claimant's case record based on the following factors: (1) supportability; (2) consistency; (3) relationship with the claimant; (4) specialization; and (5) other factors that tend to support or contradict the opinion. *See* 20 C.F.R. § 404.1520c(b), (c)(1)-(5) (2021) (emphasis added). Moreover, when a medical source provides more than one opinion or finding, the ALJ will evaluate the persuasiveness of such opinions or findings "together in a single analysis" and need not articulate how he or she considered those opinions or findings "individually." 20 C.F.R. § 404.1520c(b)(1) (2021).

In evaluating the persuasiveness of an opinion or finding, the SSA deems supportability and consistency "the most important factors," and, thus, the ALJ must address those two factors in evaluating the persuasiveness of medical opinions or prior administrative medical findings. 20 C.F.R. § 404.1520c(b)(2) (2021).[17] In evaluating the supportability of a medical opinion, "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) … the more persuasive the medical opinions … will be." 20 C.F.R. § 404.1520c(c)(1). In assessing the consistency factor, "[t]he more consistent a medical opinion(s) … is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) … will be." 20 C.F.R. § 404.1520c(c)(2).

---

medical issue made by [the SSA's] Federal and State agency medical and psychological consultants at a prior level of review." 20 C.F.R. § 404.1513(a)(5) (2021).

[17] "Supportability" means "[t]he extent to which a medical source's opinion is supported by relevant objective medical evidence and the source's supporting explanation." Revisions to Rules, 82 Fed. Reg. at 5853; *see also* 20 C.F.R. § 404.1520c(c)(1). "Consistency" denotes "the extent to which the opinion is consistent with the evidence from other medical sources and nonmedical sources in the claim." Revisions to Rules, 82 Fed. Reg. at 5853; *see also* 20 C.F.R. § 404.1520c(c)(2).

The new regulations also alter the way the ALJ discusses the medical opinions or findings in the text of the decision. *See* 20 C.F.R. § 404.1520c(b)(2). After considering the relevant factors, the ALJ is not required to explain how she considered each of them. Instead, when articulating her finding about whether an opinion is persuasive, the ALJ need only explain how she considered "the most important factors" of supportability and consistency. *See* 20 C.F.R. § 404.1520c(b)(2). The ALJ may comment on the other factors, including the source's relationship with the claimant, but generally has no obligation to do so. *See* 20 C.F.R. § 404.1520c(b)(2)-(3) (2021).

When the ALJ finds two or more opinions or findings about the same issue are both equally well-supported and consistent with the record, but are not exactly the same, the ALJ must consider the most persuasive factors, including the nature and extent of the medical source's relationship with the claimant and area of specialization, as well as the catch-all "other factors that tend to support or contradict a medical opinion or prior administrative medical finding." 20 C.F.R. § 404.1520c(b)(3), (c)(3)-(5).

Doby argues the ALJ erred by improperly evaluating the opinion evidence. In particular, she argues the ALJ failed to evaluate the opinions of Dr. Somner, Thayer and Miller separately; instead, addressing them collectively. She contends the ALJ deemed these various opinions unpersuasive in their entirety, notwithstanding the relative consistency among them, while finding the opinions of the state agency consultants "generally persuasive." First, the court finds Doby's contention that the ALJ collectively addressed the opinions of Dr. Somner, Thayer and Miller simply incorrect. A review of the decision clearly shows that the ALJ addressed each of these opinions independently of the others. Specifically, with regard to Dr. Somner, the ALJ found her July 1, 2017, opinion, in which she assessed marked limitations in the majority of work-related mental abilities, and in which she found that Arnold's ability to work on a regular and sustained basis would be negatively impacted at least 20 percent of the time by his impairments, thereby resulting in an inability to work on a regular and sustained basis, not persuasive. (R. at 24.) The ALJ

correctly noted that Dr. Somner's opinion was rendered almost five months prior to Arnold's amended alleged onset date, and her opinion, therefore, related to a previously adjudicated period. (R. at 24.) Additionally, the ALJ stated that the mental health treatment notes relevant to the period at issue indicated Arnold was doing well, mental status examinations were mostly unremarkable, he denied depression, and his condition was stable. (R. at 24.) For instance, in January and September 2018, Arnold was doing well with no acute concerns. In January 2018, he reported chronic depression that Dr. Jeffer opined was situational and personality driven. However, Arnold denied acute depression, suicidal ideation and hallucinations, and he reported stable sleep and appetite. In April 2018, Arnold reported a low level of depression, and he felt his medications were stable, again noting good sleep and appetite and no suicidal ideation or hallucinations. In both January and April 2018, Arnold's mental status examinations were mostly normal, including being neatly groomed; having a depressed mood with congruent affect, which was blunted, but euthymic; linear and goal-oriented thought process; thought content without rumination and delusions; intact attention; good judgment and insight; and he was alert and fully oriented. In September 2018, Arnold reported an ability to complete activities of daily living and errands, and he denied suicidal ideation and hallucinations. His mental status examination was the same, except Arnold's mood was "okay, I guess." In January 2018, his recurrent major depression was in partial remission, and in April and September 2018, it was in full remission.

With regard to mental health nurse practitioner Thayer, she opined in February 2020 that Arnold had mostly marked limitations in the work-related mental abilities assessed in a Mental Impairment Questionnaire. She further opined Arnold had marked difficulty in maintaining social functioning and had marked deficiencies in concentration, persistence or pace, and he had experienced four or more repeated episodes of decompensation, each of at least two weeks duration and within a 12-month period. Thayer found Arnold would be absent from work more than four days monthly, and she related the limitations contained in the Questionnaire back to January 18, 2015. However, the ALJ found Thayer's opinion

not persuasive, as it was "not at all consistent with the mental health treatment record, including … Thayer's own treatment notes." (R. at 25.) "The more consistent a medical opinion(s) … is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive [it] will be." 20 C.F.R. § 404.1520c(c)(2) (2021). Specifically, the ALJ correctly stated Thayer's notes indicated Arnold denied depression, anxiety, hallucinations, sleep disturbances and suicidal ideation. (R. at 25.) She additionally stated Arnold's mental status examinations were mostly unremarkable, reflecting calm and cooperative behavior, intact insight and judgment and intact memory and cognition. (R. at 25.)

As for psychologist Miller, the ALJ found his September 2020 opinion not persuasive, as he failed to provide a function-by-function residual functional capacity assessment of Arnold. (R. at 25.) Instead, the ALJ noted that Miller opined, as a practical matter and based on Arnold's having experienced "multiple episodes of decompensation" related to efforts to return to work, that his treatment should be aimed at reducing prodromal signs and symptoms of a psychotic disorder. (R. at 25.) He further opined the risk of Arnold again decompensating would be substantially increased by efforts directed at returning him to work. (R. at 25.) However, the ALJ found Miller overstated Arnold's decompensation episodes because the record contained evidence of only two such prior episodes, one in August 2014, and another in February 2015, both of which were remote in time and not relevant to the period at issue. (R. at 25.) Moreover, the ALJ correctly stated that, although Miller opined the limitations he proposed would relate back to January 18, 2015, Arnold's initial alleged onset date, this was a previously adjudicated period, and Arnold later had amended his alleged onset date to December 21, 2017.

The ALJ found the administrative medical findings of Deaver and Leizer, the state agency consultants, generally were persuasive, noting they had familiarity with other evidence in the claim, as well as an understanding of the disability program's policies and evidentiary requirements. (R. at 24.) Under the regulations, the ALJ was entitled to rely on

the state agency psychologists' assessments. *See* 20 C.F.R. § 404.1513a(3)(b)(1) (2021) ("State agency medical or psychological consultants are highly qualified and experts in Social Security disability evaluation."). The ALJ further noted that, while their limitations were somewhat consistent with the medical record, she found Arnold was more limited based on his testimony and a mental status examination that documented low average intellectual functioning, memory difficulty and maladaptive behaviors. (R. at 24.) In particular, she cited to psychologist Miller's finding of low average intellectual ability based on observed vocabulary, general fund of information and level of educational history and attainment. Additionally, the results of the ABAS-3 indicated overall adaptive behavior in the extremely low range.

Moreover, not in connection with the discussion of any particular medical source's opinion, the ALJ correctly stated that the relevant mental health treatment notes indicated Arnold was doing well, mental status examinations were mostly unremarkable, his condition was stable, and he denied depression. (R. at 25.) Specifically, she stated the mental health treatment notes reflected Arnold did well on his medication regimen, even denying psychiatric symptoms at times, and his depression was characterized as stable, if not in partial or full remission. (R. at 23.) Further, the ALJ correctly stated Arnold experienced no episodes of decompensation during the relevant time, and his treatment was routine and conservative, consisting exclusively of medication management, which he received, at most, every three months. (R. at 23.) "If a symptom can be reasonably controlled by medication or treatment, it is not disabling." *Gross v. Heckler*, 785 F.2d 1163, 1166 (4th Cir. 1986). Finally, the ALJ noted Arnold's activities of daily living, which included caring for his elderly mother, managing his personal care, preparing his own meals, washing dishes, hauling trash, doing laundry, mailing bills, driving a vehicle, grocery shopping independently, handling his personal finances and spending time with family, as well as his ability to get along well with authority figures, were inconsistent with his alleged symptom severity. (R. at 23.) The regulations allow an ALJ to consider a

claimant's activities of daily living in evaluating his allegations. *See* 20 C.F.R. § 404.1529(c)(3)(i) (2021).

For all the above-stated reasons, I find substantial evidence supports the ALJ's evaluation of the medical opinion evidence and prior administrative medical findings. For the reasons that follow, I, likewise, find the ALJ did not err by failing to conduct a function-by-function analysis of Arnold's work-related abilities, and substantial evidence supports her residual functional capacity finding.

It is true that in assessing a claimant's residual functional capacity, an ALJ "must first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis" before the residual functional capacity may be stated "in terms of the exertional levels of work. …" *Mascio v. Colvin*, 780 F.3d 632, 636 (4th Cir. 2015) (quoting S.S.R. 96-8p, WEST'S SOCIAL SECURITY REPORTING SERVICE, Rulings (West Supp. 2013), 1996 WL 374184, at *1, (July 2, 1996)); *see also Monroe v. Colvin*, 826 F.3d 176, 188-89 (4th Cir. 2016) (emphasizing the ALJ must "build an accurate and logical bridge from the evidence to his conclusion" and holding that remand was appropriate when the ALJ failed to make "specific findings" about whether the claimant's limitations would cause him to experience his claimed symptoms during work and, if so, how often) (citation omitted). In *Mascio* and *Monroe*, the court remanded because the ALJ failed to adequately explain how he arrived at conclusions regarding the claimant's residual functional capacity. *See Mascio*, 780 F.3d at 636; *Monroe*, 826 F.3d at 189. The ALJ's residual functional capacity assessment "must include a narrative discussion describing" how specific medical facts and nonmedical evidence "support[] each conclusion" in the residual functional capacity finding. *Mascio*, 780 F.3d at 636 (quoting S.S.R. 96-8p, 1996 WL 374184, at *7). Here, Doby argues, specifically, that the ALJ failed to perform a proper function-by-function analysis of Arnold's following abilities: (1) to interact with co-workers and supervisors; (2) to maintain concentration for

extended periods; and (3) to maintain a regular, punctual schedule within customary tolerances. Based on my review of the record, I find that Doby's arguments fail.

First, *Mascio* does not set out "a per se rule requiring remand when the ALJ does not perform an explicit function-by-function analysis." 780 F.3d at 636. Instead, remand should be considered "where an ALJ fails to assess a claimant's capacity to perform relevant functions, despite contradictory evidence in the record, or where other inadequacies in the ALJ's analysis frustrate meaningful review." *Mascio*, 780 F.3d at 636 (quoting *Cichocki v. Astrue*, 729 F.3d 172, 177 (2d Cir. 2013)). Thus, Doby cannot claim error simply because the ALJ did not explicitly set forth a detailed analysis for each of Arnold's functional abilities as long as the ALJ's conclusions are ascertainable from her narrative discussion and supported by the record. I find this is the case.

It is clear from the ALJ's decision that she thoroughly considered the evidence pertaining to Arnold's ability to interact with co-workers and supervisors; to maintain concentration for extended periods; and to maintain a regular, punctual schedule within customary tolerances and built an accurate and logical bridge from the evidence to her conclusions. With regard to interacting with co-workers and supervisors, the ALJ found in her decision that Arnold was moderately limited in his ability to interact with others, and he had the residual functional capacity to occasionally interact with co-workers and supervisors and to participate and cooperate with them during the training period for unskilled work. (R. at 19.) In support of this finding, the ALJ acknowledged the following findings on mental status examinations during the relevant period: slow speech; a depressed mood; a congruent, blunted, sad and tearful affect; that he isolated himself, but this was something he always did; he did not like to talk to others; he made poor eye contact; he appeared formidable at times; he was guarded and withholding; he had pressured speech at times; he was shy and reserved; he presented with low energy and neutral facial expressions; and he displayed a minimal sense of humor. However, the ALJ noted that other findings included a neutral mood; a euthymic affect; cooperative and calm

behavior; normal volume speech; and he established fair rapport with the examiner in September 2020. The ALJ also noted the testing results and Arnold's own testimony and reports in arriving at her findings. In particular, she acknowledged the PAI indicated Arnold was a socially isolated individual with few personal relationships. (R. at 19.) In November 2020, he testified he was not a social person, he did not attend church, and he did not go to movies. (R. at 21.) However, the ALJ noted Arnold's testimony that he could grocery shop in stores, visit with his sister, mail bills and drive his mother to appointments. (R. at 21.) She further noted that, despite reporting in September 2018, that interactions with others caused anxiety, he stated he could complete his daily activities and run errands. (R. at 22.) Although Arnold reported continued social isolation in December 2018 and a panic attack prior to meeting with family for Thanksgiving, he had not had any episodes since then. (R. at 22.) The ALJ acknowledged Arnold's statement in an April 2019 Function Report that he had difficulty in crowds. (R. at 21.) The ALJ, similarly, noted Arnold's report to Thayer, in November 2019, that he did not like people much, but he was calm and cooperative during the examination. In May 2020, Arnold did advise Thayer he spoke with a friend on the phone. At that time, although he indicated he would sometimes become confused and not know how to proceed socially, the ALJ correctly noted that Thayer stated such statements appeared practiced or contrived. (R. at 22.) Lastly, the ALJ noted Arnold's statements that he got along with authority figures and had never lost a job due to interpersonal reasons. (R. at 23.)

Next, the ALJ, likewise, supported her finding that Arnold could maintain attention and concentration for two-hour segments. In particular, she stated that, on examination in January 2018 and April 2019, Arnold's attention was intact. She noted that, in September 2020, Arnold's personal pace and ability to process information efficiently and quickly were slowed by his depressed mood and possible medication side effects. However, he could recite the alphabet and spelled "house" and his last name both forward and backward. Further, Arnold successfully repeated digits after one rehearsal, and he exhibited no problems with impulse control. Thus, the ALJ concluded Arnold had a moderate limitation

in maintaining concentration, persistence or pace. (R. at 19.) In other portions of her decision, the ALJ noted that Arnold cared for his disabled mother, including grocery shopping and driving her to appointments. (R. at 20, 22-23.) Moreover, she noted that, despite allegations contained in Arnold's April 2019 Function Report, as well as his November 2020 hearing testimony, that he had difficulty concentrating, he also testified he watched television and played video games all day. (R. at 21.) The ALJ further noted that Arnold's mental status examinations generally were unremarkable, with no concentration deficits noted, and in September 2018 he stated he could complete activities of daily living and run errands. (R. at 21-22.) The ALJ noted that Arnold alleged no problems with personal care, he prepared meals daily, washed dishes, hauled trash, did laundry, mailed bills, shopped in stores independently and could manage his personal finances. (R. at 23.) The ALJ also noted that a September 2020 psychological evaluation reflected Arnold had intact attention. (R. at 22-23.)

For the following reasons, I also find the ALJ supported her finding regarding Arnold's ability to maintain a regular, punctual schedule within customary tolerances. As stated above, the ALJ emphasized Arnold's ability to care for his disabled mother's daily needs, including grocery shopping and driving her to appointments. (R. at 20, 22.) In that same vein, she found he was able to function outside the home, including driving and grocery shopping. (R. at 20.) The ALJ noted Arnold's statement that he could perform activities of daily living and run errands. (R. at 22.) As stated above, the ALJ noted mostly unremarkable mental status examinations and that Arnold's condition was either in partial or full remission on medication therapy only. (R. at 21, 23.) The ALJ also noted that, at multiple treatment visits, Arnold had no acute concerns, and his condition was stable. (R. at 21-23.) Finally, the ALJ noted that Arnold did not experience episodes of decompensation during the relevant period, and he sought conservative medication treatment, at most, every three months. (R. at 23.)

For the above-stated reasons, I find the ALJ's conclusions are ascertainable from her narrative discussion and supported by the record, thereby allowing for meaningful review by the court. That being the case, I find that the ALJ did not err by failing to perform a function-by-function analysis of Arnold's work-related mental abilities before crafting her residual functional capacity finding, which is substantially supported by the evidence referenced above.

Lastly, Doby contends, in an argument relegated to a footnote in her brief, that the ALJ erred by failing to resolve an apparent conflict between the vocational expert's testimony and the DOT's description of the requirements of two of the three occupations the vocational expert found Arnold could perform based on the ALJ's residual functional capacity finding. I am not persuaded by Doby's argument. It is true that the ALJ must insure that any apparent conflicts between the vocational expert's testimony and the DOT are reasonably resolved. *Thomas v. Berryhill*, 916 F.3d 307, 313 (4th Cir. 2019) (citing S.S.R. 00-4p, 2000 WL 1898704, at *2 (Dec. 4, 2000)). The vocational expert found that Arnold could perform the jobs of a housekeeping cleaner, a cleaner II and a collator operator. Doby argues that the ALJ's limitation in the residual functional capacity finding to "simple, routine tasks that involve no more than one to two steps" is consistent with jobs with a reasoning level of 1. However, Doby argues that the jobs of a cleaner II and a collator operator are characterized in the DOT as requiring reasoning levels of 2, meaning they require an ability to "carry out detailed but uninvolved written or oral instructions." Thus, Doby argues this level of reasoning is more than what the ALJ's residual functional capacity finding indicates Arnold could do, thereby creating an apparent conflict that the ALJ failed to resolve. Nonetheless, as the Commissioner argues in her brief, even assuming this is the case, the remaining job identified by the vocational expert, that of a housekeeping cleaner, required a reasoning level of 1, which is consistent with the ALJ's residual functional capacity finding, and remand is not warranted where there is at least one suitable occupation that represents a significant number of jobs in the economy a claimant can perform. *See* 20 C.F.R. § 404.1566(b) (2021) ("Work exists in the national economy when

there is a significant number of jobs (in one or more occupations) having requirements which you are able to meet. …").

Doby further argues the vocational expert failed to explain how she arrived at the number of housekeeping cleaner jobs available in the national economy. Again, the court is not persuaded. In particular, the vocational expert stated she was reducing the number of housekeeping cleaner jobs to account for Arnold's limitation to no public contact. She stated she eliminated housekeeping cleaner jobs in hotels and motels, as these types of settings might require more public contact. Instead, the vocational expert limited her finding to those jobs in office and school settings that could be performed after hours when no one was usually present. (R. at 62-63.) After limiting the occupation in this manner, the vocational expert testified there would be 110,125 housekeeping cleaner jobs in the national economy. (R. at 63.) The vocational expert further explained that the DOT does not address the concept of contact with others, so her testimony in that regard was based on her "professional experience in performing onsite job analyses, labor market restrictions, [and] job placement." (R. at 64.)

Based on the above-stated reasons, the court finds that the vocational expert's testimony that there was a significant number of housekeeping cleaner jobs in the national economy Arnold could perform, given the ALJ's residual functional capacity finding, constituted substantial evidence on which the ALJ was entitled to rely in concluding Arnold was not disabled.

## PROPOSED FINDINGS OF FACT

As supplemented by the above summary and analysis, the undersigned now submits the following formal findings, conclusions and recommendations:

1. Substantial evidence exists in the record to support the ALJ's consideration of the medical opinion evidence and prior

administrative medical findings;

2. Substantial evidence exists in the record to support the ALJ's residual functional capacity finding; and

3. Substantial evidence exists in the record to support the Commissioner's finding that Arnold was not disabled under the Act and was not entitled to DIB benefits.

## RECOMMENDED DISPOSITION

The undersigned recommends that the court deny Doby's motion for summary judgment, grant the Commissioner's motion for summary judgment and affirm the Commissioner's decision denying benefits.

## **Notice to Parties**

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(C):

Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14-day period, the Clerk is directed to transmit the record in this matter to the Honorable James P. Jones, Senior United States District Judge.

The Clerk is directed to send certified copies of this Report and Recommendation to all counsel of record at this time.

DATED:    June 23, 2022.

/s/ *Pamela Meade Sargent*

UNITED STATES MAGISTRATE JUDGE